**NATIONAL FREIGHT, INC., Plaintiff,**

v.

**CONSOLIDATED CONTAINER COMPANY, LP, et al.,**
**Defendants.**

**CIVIL ACTION NO. 1:14-CV-03429-AT**

United States District Court,
N.D. Georgia, Atlanta Division.

Signed 01/26/2015

J. Stephen Berry, James Randolph Evans, Dentons U.S., LLP, Robin A. Besaw, McKenna Long & Aldridge, LLP, Atlanta, GA, for Plaintiff.

Jackson Anthony Dial, Frederick Newman Sager, Jr., Michael Alan Holcomb, Richard H. Hill, II, Jackson Anthony Dial, Weinberg Wheeler Hudgins Gunn & Dial, LLC, Atlanta, GA, for Defendants.

## ORDER

Amy Totenberg, United States District Judge

At its heart, this declaratory judgment action is about indemnity. Plaintiff National Freight, Inc. ("NFI") and Defendant Consolidated Container Company, LP ("CCC") were defendants in a tort action in Florida. CCC's insurers, Defendants American Home Assurance Company and AIG Assurance Company (together, "Insurer Defendants"), paid for CCC to defend and settle that action. Insurer Defendants are now parties to a pending arbitration in which they seek contractual indemnification against NFI for the money they spent doing so. Plaintiff seeks multiple declarations about who owes what to whom, as well as who has the ability to collect any such money. At this stage of litigation, however, the sole issue before the Court is whether any or all of these issues should be arbitrated. The Court finds that they should be, and therefore GRANTS Defendants' respective Motions to Compel Arbitration [Docs. 16, 20].

### I. FACTUAL BACKGROUND

Plaintiff NFI is a trucking company. Defendant CCC is a container company. The relationship between the two is governed by the Consolidated Container Company Motor Carrier Transportation Agreement (the "Transportation Agreement" or "Agreement"). (Doc. 1–1) The "nature" of that agreement is that CCC tenders "shipments of goods," i.e., containers, to NFI,

and NFI renders "transportation services for such shipments." (*Id.* ¶ 1.)

The Transportation Agreement comprised other provisions that are relevant here. One required NFI to indemnify CCC "from any and all liability resulting from any claims, demands, or judgments resulting from" injury to persons "arising from, or as a consequence of" NFI's performance under the Agreement. (*Id.* ¶ 12.) A subsequent provision creates an exception to this indemnity for "claims, loss, damage, or expense ... attributable solely to the negligence ... of CCC, its employees or agents." (*Id.* ¶ 14.) Finally, the Transportation Agreement also provides that "[a]ny dispute arising out of this Agreement shall be submitted to the American Arbitration Association under its rules then enforced." (*Id.* ¶ 15.) The Agreement was executed in October 2004. (*Id.* ¶ 5.)

In June 2007, CCC tendered a container, and NFI rendered shipment. (Compl. ¶¶ 18–20.) The load did not fill the container, so, before the CCC container was hitched to an NFI tractor, a CCC "agent/employee" installed two "load bars" to secure the load. (*Id.* ¶ 19.) The container was transported, unhitched, and moved around the destination facility. (*Id.* ¶¶ 20–21.) When Anthony Hurge, an employee at the destination facility, opened the door to unload the container, one of the load bars fell forward out of the container and struck him in the head. (*Id.* ¶ 21–22.)

Mr. Hurge and his kin sued NFI and CCC in Orange County, Florida (the "Hurge Action"). (*Id.* ¶ 23–24.) The Hurges alleged, among other things, negligence on the part of both NFI and CCC. (*Id.* ¶¶ 25–26.) At trial, NFI obtained a directed verdict in its favor, at which point CCC settled the case.

Prior to the trial in the Hurge Action, CCC demanded that NFI provide it indemnification pursuant to the Transportation Agreement. (*Id.* ¶ 34.) CCC never followed up by seeking contractual indemnification from NFI, but, subsequent to the filing of the original complaint in this action, its insurers did—via a demand for arbitration. Those insurers, the Insurer Defendants, were added as defendants in Plaintiff's Amended Complaint. (Doc. 8.)

Plaintiff seeks the following declarations:

- *Count 1*: That CCC's indemnity claim arising from the Hurge Action is not subject to the arbitration clause in the Transportation Agreement. (*Id.* ¶¶ 38–42.)
- *Count 2*: That CCC is not entitled to indemnification for its sole negligence. (*Id.* ¶¶ 43–46.)
- *Count 3*: That CCC is not entitled to indemnification for acts that did not arise out of NFI's performance under the Transportation Agreement. (*Id.* ¶¶ 47–54.)
- *Count 5*: That Insurer Defendants' subrogation clauses in their respective contracts with CCC do not provide them with standing to bring any direct action against NFI. (*Id.* ¶¶ 60–64.)
- *Count 6*: That Insurer Defendants' subrogation clauses in their respective contracts with CCC do not provide them with standing to force NFI to arbitration. (*Id.* ¶¶ 65–70.)

In *Count 4*, Plaintiff seeks common law indemnity from CCC for amounts NFI spent in defending the Hurge Action, (*id.* ¶¶ 55–59), and in *Count 7*, Plaintiff seeks to preliminarily enjoin Insurer Defendants from proceeding with the ongoing arbitration.[1] (*Id.* ¶¶ 71–78.)

---

1. Count 7 has been rendered **MOOT** by a prior Order of this Court. (Doc. 25.)

## II. LEGAL STANDARD

■ Defendants have asked the Court to compel arbitration under Section 3 of the FAA. (Docs. 16–1 at 1, 20–1 at 1.) As a starting place, the Court is "mindful of the Supreme Court's instruction that "arbitration is simply a matter of contract.'" *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1116 (11th Cir.2014), *cert. denied*, —— U.S. ——, 135 S.Ct. 144, 190 L.Ed.2d 231 (2014) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). As a result, gateway issues of arbitrability—including "whether [an arbitration] agreement covers a particular controversy"—are typically for a court to decide. *Martinez v. Carnival Corp.*, 744 F.3d 1240, 1246 (11th Cir.2014) (internal quotation and citation omitted).

■ However, a court may determine that parties agreed to arbitrate "the very issue of arbitrability where there is clear and unmistakable evidence that they did so." *Id.* For example, "when parties incorporate the rules of the [American Arbitration] Association into their contract, they 'clearly and unmistakably agree[ ] that the arbitrator should decide whether the arbitration clause [applies].'" *U.S. Nutraceuticals, LLC v. Cyanotech Corp.*, 769 F.3d 1308, 1311 (11th Cir.2014) (quoting *Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir.2005)).

## III. DISCUSSION

As described above, CCC has a contract with Plaintiff whereas Insurer Defendants do not. Based on this significant difference, the motions to compel are properly treated separately.

### A. Claims against CCC

■ CCC argues that all four of NFI's claims against it should either be compelled to arbitration or dismissed on the merits. With regard to the declarations sought by NFI (Counts 1–3), CCC contends that the Transportation Agreement evidences the parties' "clear and unmistakable" agreement to arbitrate the issue of arbitrability. (Doc. 16–1 at 8.) As a back-up argument, CCC asserts that the Court should determine the dispute is arbitrable and then compel arbitration. (*Id.* at 10.) With regard to the common law indemnity claim in Count 4, CCC urges the Court to dismiss it with prejudice because it fails to state a claim. (*Id.* at 16.) Alternatively, CCC asserts that the Court should compel arbitration on this claim as well because it "arises out of" the Transportation Agreement and is therefore covered by the arbitration provision. (*Id.* at 22.)

NFI responds by pointing out the many ways in which the events giving rise to both CCC's potential indemnity claim and NFI's indemnity claim do not, in fact, arise out of the Transportation Agreement. (Doc. 19 at 5–20.) NFI's arguments, however, require the Court to make the preliminary determination that it, and not an arbitrator, should decide the arbitrability of NFI's claims.

The Court will not do so, because *Terminix* and its progeny require the Court to compel arbitration of all claims between NFI and CCC. NFI and CCC contracted to submit "[a]ny dispute arising out of" the Transportation Agreement to the American Arbitration Association ("AAA") under its rules. (Doc. 1–1 ¶ 15.) AAA Rule 7(a) dictates that an arbitrator has the "power to rule on his or her own jurisdiction, including any objections with respect to the existence, **scope**, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Am. Arbitration Ass'n, Commercial Arbitration Rules, Rule 7(a), https://www.adr.org/aaa/faces/?doc=ADRSTG_004130 (emphasis added). Both *Terminix* and *Nutraceuticals* decided the same issue based on the

same AAA rule[2] and almost exactly the same arbitration clause language and held that "[w]hen the parties incorporated into [their] contract the rules of the [American Arbitration] Association, they clearly and unmistakably contracted to submit questions of arbitrability to an arbitrator." *Nutraceuticals,* 769 F.3d at 1311; *see also Terminix,* 432 F.3d at 1332; *Regal Lager, Inc. v. The Baby Club on Am., Inc.,* No. 1:06–CV–0962–JEC, 2006 WL 3388435, at *4 (N.D.Ga. Nov. 21, 2006) (holding that arbitrator must determine whether arbitration clause should be enforced because contract incorporated AAA rules). One of those question—the "substantive" issue of arbitrability—is "whether a particular dispute falls within the scope of an arbitration clause." *Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1109 (11th Cir.2004).

Accordingly, the parties have clearly and unmistakably agreed to let an arbitrator decide the scope of the arbitration agreement. As the arbitrator may find the Agreement covers all claims made in Counts 1–4, the Court has "no business weighing the merits" of any of those claims. *AT & T Technologies, Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers of Am. v. Am. Mfg. Co.,* 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960)). Defendant CCC's Motion to Compel Plaintiff to arbitrate Counts 1–4 of the Amended Complaint is therefore GRANTED.

### B. Claims Against Insurer Defendants

The calculus is different for the claims against the Insurer Defendants but the result is the same. While NFI and CCC indisputably made an agreement to arbitrate, Insurer Defendants were not a party to that contract and have not alleged any other arbitration contract with NFI. Rather, Insurer Defendants move to compel arbitration of this case for two reasons. First and foremost, Insurer Defendants argue that their standing to enforce the arbitration clause is properly considered an issue of arbitrability under the Transportation Agreement, and therefore should be arbitrated. (Doc. 20–1 at 4.) Alternatively, Insurer Defendants argue that the Court should consider arbitrability and decide that Insurer Defendants both do have standing to enforce the Transportation Agreement's arbitration clause—and do have standing to bring a direct action against NFI—as a result of their status as equitable or contractual subrogees of CCC. (*Id.* at 9–15.) NFI responds that the language of their respective subrogation agreements does not grant Insurer Defendants a right to bring an action in their own name. (*See* Doc. 30.)

■ As there is no contractual agreement between NFI and Insurer Defendants, there is no "clear and unmistakable" evidence that they agreed to arbitrate arbitrability. *Martinez,* 744 F.3d at 1246. Thus, the Court must decide that issue, and no presumption of arbitrability applies. *Granite Rock,* 561 U.S. at 301, 130 S.Ct. 2847. Rather, in this context, a nonparty to an arbitration agreement may force arbitration "if the relevant state contract law allows him to enforce the agreement." *Lawson v. Life of the S. Ins. Co.,* 648 F.3d 1166, 1170 (11th Cir.2011) (quoting *Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 632, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009)).

■ The fundamental state law[3]

---

**2.** At the time of *Terminix,* modern-day Rule 7(a) was codified at Rule 8(a). By the time *Nutraceuticals* was decided, the Rule had moved to its current location.

**3.** Georgia law applies. The Transportation Agreement contains a choice-of-law clause stating that Georgia law applies to the interpretation and enforcement of the contract. (Doc. 1–1 at 15.) "In diversity cases, the

question at issue is: do Insurer Defendants have the right to force NFI to arbitrate its claims by virtue of their contracts with CCC and their payment to defend and settle the Hurge Action? The answer, according to the parties, lies in the doctrine of subrogation.

### 1. Subrogration

In Georgia, subrogation is defined as:

the substitution of another person in the place of the creditor, so that the person in whose favor it is exercised succeeds to *all the rights of the creditor*. It is of equitable origin, being founded upon the dictates of refined justice, and its basis is the doing of complete, essential, and perfect justice between the parties, and its object is the prevention of injustice.

*State Dep't of Corr. v. Developers Sur. & Indemn. Co.*, 295 Ga. 741, 763 S.E.2d 868, 871 (2014) (emphasis added) (quoting *Bankers Trust Co. v. Hardy*, 281 Ga. 561, 562, 640 S.E.2d 18 (Ga.2007). "The right of subrogation can arise from equity, contract or statute." *Jones Motor Co. v.*

*Anderson*, 268 Ga.App. 458, 602 S.E.2d 228, 230 (2004). Only contract and equity are relevant here.

Georgia courts are split as to exactly what rights are transferred by the specific contractual language contained in Insurer Defendants' respective subrogation provisions.[4] The Court need not resolve this apparent inconsistency because Insurer Defendants also seek equitable subrogation in their demand for arbitration. (Doc. 8–1 at 2 ("[Insurer Defendants] are subrogated to the rights of their insured, CCC, under both the terms of the insurance contracts and the common law doctrine of equitable subrogation.")). In Georgia, equitable subrogation does not require a "formal assignment of rights" prior to bringing a cause of action. *Jones Motor Co.*, 602 S.E.2d at 230. And contrary to Plaintiff's assertion, (Resp. at 14 n.6), Georgia courts have not barred a party from bringing both equitable and contractual subrogation claims simultaneously. *See Wilkinson Homes, Inc. v. Stewart Title Guar. Co.*, 271 Ga.App. 577, 610 S.E.2d 187, 192 (2005) ("Even assum-

---

choice-of-law rules of the forum state determine what law governs." *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir.2013) (citation omitted). Pursuant to Georgia law, contractual choice-of-law provisions "will be enforced unless application of the chosen law would be contrary to the public policy or prejudicial to the interests of this state." *CS–Lakeview at Gwinnett, Inc. v. Simon Prop. Grp., Inc.*, 283 Ga. 426, 428, 659 S.E.2d 359 (Ga.2008) (citation omitted). Neither party has suggested that any public policy would be contravened by the application of the choice-of-law provision. Accordingly, Georgia law governs the interpretation and enforcement of the arbitration provision. *See also First Benefits, Inc. v. Amalgamated Life Ins. Co.*, No. 5:13–CV–00037–MTT, 2014 WL 1255200, at *2 (M.D.Ga. Mar. 26, 2014).

4. The insurance policies at issue here both transfer "rights to recover" from CCC to the respective Insurer Defendants. (Doc 8–1 at 3

n.1). In *Allstate Insurance Co. v. Welch*, a Georgia Court of Appeals held the transfer of "rights of recovery" (as opposed to a "right of action") in an insurance contract, followed by payment under that contract, created "at best, an assignment of an entitlement to the proceeds for [the insured's] damage claim at some point in the future." 259 Ga.App. 71, 576 S.E.2d 57, 57–58 (2003); *see also Villanueva v. First Am. Title Ins. Co.*, 313 Ga.App. 164, 721 S.E.2d 150, 154 (2011) *aff'd*, 292 Ga. 630, 740 S.E.2d 108 (2013) (distinguishing *Welch* and holding insurer contractually subrogated to "all rights and remedies" could maintain breach of contract action against party to subrogor's contract). However, in *U.S. Fidelity & Guaranty Co. v. J.I. Case Co.*, a Georgia Court of Appeals held the transfer of "rights to recover" in an insurance contract, followed by payment under that contract, assigned a right of action to the insurer and made the insurer the real party in interest. 209 Ga.App. 61, 432 S.E.2d 654, 656 (1993).

ing that the [contract] does not provide Stewart Title any contractual [subrogation rights], the doctrine of equitable subrogation applies here" because Stewart Title settled a claim on behalf of its insured); *Vigilant Ins. Co. v. Bowman*, 128 Ga.App. 872, 198 S.E.2d 346, 347 (1973) ("[I]n addition to whatever equitable right [the insurer] had to subrogation, it also had the specific contractual right thereto once it made payment to its insured, under the terms of its policy."); s*ee also Fid. & Deposit Co. of Maryland v. C.E. Hall Const., Inc.*, No. CV411–102, 2012 WL 1100658, at *6 (S.D.Ga. Mar. 30, 2012) ("Georgia courts have yet to directly decide whether the equitable common law remedy of subrogation is duplicative where relief is also sought pursuant to express indemnity agreements.").

As Insurer Defendants paid to defend and settle the Hurge Action on behalf of CCC, they may be equitably subrogated and "succeed[ ] to all the rights of" CCC to the extent that they paid CCC's claims related to the Hurge Action. *State Dep't of Corr.*, 763 S.E.2d at 871. It is unsettled in Georgia whether one of those rights is the right of action to enforce contractual indemnity or arbitration obligations owed to the subrogor by a third party. However, a similar situation arises with some frequency in the insurance context. And in that context, it is well settled that "an insurance company that pays a claim has a right of subrogation to seek reimbursement from another insurer that should have satisfied the claim," as long as the insurer that paid had a "duty under its policy to pay the loss." Barbara J. Van Arsdale, 16 Ga. Jur. Insurance § 25:1 (2014); *see also Nat'l Union Fire Ins. Co. v. Am. Motorists Ins. Co.*, 269 Ga. 768, 769, 504 S.E.2d 673 (Ga.1998). The latter requirement is known as the Voluntary Payment Doctrine.

Under the Voluntary Payment Doctrine, "[t]he general rule is that an insurer's voluntary payment to its insured does not give rise to a right of subrogation." *S. Mut. Church Ins. Co. v. ARS Mech., LLC*, 306 Ga.App. 748, 703 S.E.2d 363, 366 (2010) (citation omitted); *see also* O.C.G.A. § 13–1–13. At the same time, the Voluntary Payment Doctrine does not apply when the parties have entered into a subrogation agreement. *Federated Mut. Ins. Co. v. Northland Ins. Co.*, 254 Ga. 402, 329 S.E.2d 493, 494 (1985). "The party seeking to recover payment bears the burden of showing that the voluntary payment doctrine does not apply." *ARS Mech.*, 703 S.E.2d at 366 (quoting *Energy & Process Corp. v. Jim Dally & Assoc., Inc.*, 291 Ga.App. 772, 775(1), 662 S.E.2d 835 (Ga.Ct. App.2008).

Here, Insurer Defendants paid claims related to the Hurge Action, but it is unclear if Insurer Defendants had contractual obligations under their respective policies to pay those claims. Neither party has briefed or even mentioned the Voluntary Payment Doctrine, nor submitted the relevant insurance contracts to the Court. On the information currently in the record, it is not possible to determine whether Insurer Defendants' payments of CCC's claims were mandatory under their respective policies.

However, Insurer Defendants and CCC did enter into subrogation agreements, and those agreements are in the record. As described above at n.4, the insurance policies at issue here both contain subrogation clauses that transfer "rights to recover" from CCC to the respective Insurer Defendants. (Doc 8–1 at 3 n.1). As a result, while the Court refrains from deciding whether these clauses in and of themselves grant to Insurer Defendants a right of action, *see supra* n.4, the Court does consider these clauses sufficient to render the

Voluntary Payment Doctrine inapplicable. This leads the Court to conclude that Insurer Defendants are likely equitably subrogated.

### 2. Estoppel

 This conclusion is strengthened by another equitable doctrine: equitable estoppel. "Equitable estoppel allows a nonsignatory to an arbitration agreement to compel ... a signatory to arbitrate under certain circumstances in which fairness requires doing so." *Id.* at 1172 (emphasis added) (citing *Order Homes, LLC v. Iverson*, 300 Ga.App. 332, 685 S.E.2d 304, 310 (2009); *In re Humana*, 285 F.3d 971, 976 (11th Cir.2002)). Georgia courts have applied equitable estoppel on two bases. First, cases in which "the signatory to a written agreement ... must rely on the terms of the written agreement in asserting its claims against the nonsignatory." *Autonation Fin. Servs. Corp. v. Arain*, 264 Ga.App. 755, 592 S.E.2d 96, 100–101 (2003) (quotation marks and alteration omitted) (holding that equitable estoppel is justified because the plaintiff's claim "and the allegations supporting that claim are tied directly to the [contract containing the arbitration clause]"). Second, "application of equitable estoppel is warranted when the signatory to the contract containing the arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Price v. Ernst & Young, LLP*, 274 Ga.App. 172, 617 S.E.2d 156, 160 (2005) (quoting *MS Dealer Svc. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir.1999)). At least the second basis is present here.

Application of the first basis for equitable estoppel is complicated by the posture of this case. Typically, it is the party in Insurer Defendants' position bringing a breach of contract claim against NFI, and NFI seeking to enforce the arbitration provision of the contract in which the claim is based. *See, e.g., LaSonde v. CitiFinancial Mortgage Co.*, 273 Ga.App. 113, 614 S.E.2d 224 (2005) (plaintiff who did not sign promissory note containing arbitration provision was equitably estopped from avoiding arbitration of her claims for breach of that promissory note); *see also Arain*, 592 S.E.2d 96. If Insurer Defendants were the plaintiffs here and NFI were the defendant, Insurer Defendants would no doubt be estopped from avoiding any arbitration NFI sought. Instead, Insurer Defendants followed the Transportation Agreement's dispute resolution directive and went straight to arbitration.

However, the Court need not decide whether the first basis applies, because the second one definitely does. CCC and Insurer Defendants both assert that NFI owes indemnification under the contract for money spent defending and settling the Hurge Action. NFI seeks multiple declarations: about whether it has to pay at all, about whether it has to arbitrate, and about who can require it to arbitrate. NFI also seeks—should it not owe a contractual duty to indemnify CCC—common law indemnity *from* CCC for the expenses NFI incurred in defending the Hurge Action.

NFI's claims against CCC have already been compelled to arbitration. Any declaration by an arbitrator as to CCC's contractual right to indemnity would have direct impact upon Insurer Defendants' claims. It is in this sense that "any action in regard to one inures to the benefit [or detriment] of the other," *Paine, Webber, Jackson & Curtis, Inc. v. McNeal*, 143 Ga.App. 579, 239 S.E.2d 401, 404 (1977) (compelling arbitration of claims against nonsignatory joint tortfeasor if the same claims against the signatory joint tortfeasor were compelled on remand). The potential for conflicting decisions is a factor

Georgia courts consider when deciding whether to estop signatories from raising the defense that a nonsignatory should not be permitted to compel arbitration, and that potential exists here. *See Arain,* 592 S.E.2d at 99. Other factors courts consider as bases for equitable estoppel, including the relationship between the signatory and the nonsignatory and the relationship of the claims to the arbitration contract, id. persuade the Court that "the ends of justice are more nearly met" by estopping NFI from avoiding arbitration of its claims against Insurer Defendants after its claims against CCC have been compelled to arbitration. *Paine,* 239 S.E.2d at 404.

## IV. CONCLUSION

For the foregoing reasons, Defendants' respective Motions to Compel [Docs. 16, 20] are **GRANTED**. NFI is compelled to arbitrate all claims against CCC and Insurer Defendants (except Count 7, which, again, has been rendered **MOOT** by a prior Order [Doc. 25]). The Clerk is **DIRECTED** to close the case.

**IT IS SO ORDERED** this 26th day of January, 2015.